Good morning, Your Honors. May it please the Court, Carolyn Wiggin from the Federal Defender's Office for Mr. Gabriel Johnson. And I will try to reserve two minutes for my rebuttal. Very well. Thank you. Your Honors, in November of 2009, Sacramento police officers Will Hite and Faria received a single tip from a largely untested confidential informant saying that the informant believed Mr. Johnson sold methamphetamine and lived in a house on N Street in Sacramento. The officers did a records check and learned that Mr. Johnson had a different address registered with the probation department. But they didn't bother to call Mr. Johnson's probation officers to see whether Mr. Johnson appeared to be living at the registered address or not. Counsel, you've done a good job in your brief giving us the facts. Let me ask you the significance of the facts. By the time they entered your client's room, the police had the tip. They had seen him at the residence bringing out trash. They found a key on him. They found a phone on him, which corroborated some of the information about drugs. And they went in the house and the guy in there said, yes, he lives here. Put aside the legality of how they obtained all that information. Do you agree that at that last point they had probable cause to believe that he lived there? When they went into the north bedroom of the home? Now, before they went to the north bedroom, when they opened the door with the key in his pocket and the guy inside says, yes, he lives here? I would agree that once Matthew Bamber... At that point, those facts add up to probable cause, don't they? Once Matthew Bamber says he lives here. Okay. So my question is, tell me which of those facts we can't use to determine probable cause and why. I believe you can use the single CI tip, largely uncorroborated, for what it's worth. Well, it's corroborated to some extent because the TCI provides some information about something other than your client, which turns out to be true. Well, I believe if you look at it, the officers did three surveillance sessions in front of the home. But let's assume we all agree the CI tip is not enough to establish probable cause under Howard and Harper and our cases. There's a bunch of other information, and I take it your position is, well, that other information may add up to probable cause, but you can't use it for some reason or another. Right. So tell me why. Okay. Let me unpack it a little bit. By the time they're – my position is that the search starts when they enter the backyard, and they've gone through the backyard and are in the side yard, not visible from the street. This is the cartilage is my position. The search has started. That's when they find Mr. Johnson. I believe that's a fruit of that search. So your argument is that nothing that occurs after that can be used to support probable cause, that he lived in the house. That's my primary argument. I also have backups, but that's my primary argument. Let me hear your backups, too. I believe that finding Mr. Johnson is the fruit of the search. You can't use the things you found on him. Now, even if this Court didn't agree with that, I believe that use of the key itself is also a search. Even if you think everything they did up until then was legal, use of the key under this Court's precedent is the beginning of a search. This Court – Tell me when this Court said that. I know when the Sixth Circuit has said it. But when have we said it? Your Honors, you said it in the case United States v. Portillo-Reyes. And there's been a couple decisions since then regarding automobiles where it's been questioned whether it still applies to automobiles. But they – and even in those cases, they didn't overturn it. They just said, well, we don't have to decide here. So Portillo-Reyes is still the law of this circuit. I think the United States Supreme Court's decisions of the last two years bear out the correctness of that Ninth Circuit precedent, because those cases say – many of the cases in other circuits that are saying maybe use of a key might not be a search because we don't know about the privacy interest there, what Jones and Jardines have taught us in the last two years is to remember that the Fourth Amendment is not just about privacy interests. It's also about a physical intrusion by the government to get information. That is a search. And I certainly think if putting a tracker on a car is a search, if going up to the front porch with a drug-sniffing dog in a search, testing a key in a door is a search. And does that invade a privacy interest? Well, Your Honor, in my view, we have a privacy interest in whether a key works in the lock of the door to our home. But even if this Court doesn't agree with that, it is a physical intrusion by the government to get information, and that makes it a search. Is it different in nature than a knock on a door? Put aside – I understand your other arguments that this wasn't a knock and that they entered the property illegally, but is it more of a physical intrusion than knocking on the door? Yes, because knocking on the door – Suppose they actually came in the front door and knocked on the front door. If they had walked up to the front door and knocked, that might have fallen within the knock and talk. There's an implicit license we give to people to come to our front doors, knock, wait for a minute. We don't give them an implicit license to take keys they might have and test them in our keyhole. And so that goes beyond what's allowed by knock and talk. And that is a search to obtain information. Does this key work? On the knock and talk issue, if the police had entered through the front yard, gone through the gate, and then knocked on your – on the side door, would that have been okay? I don't believe – what the CI told these officers is Johnson has – Johnson goes in and out through the side door. He doesn't say it's the front door. I think both below and in the government's briefing here, they've conceded that the door at the top of the porch steps on the sidewalk side appears to be the front door. That's what visitors would assume the front door is. They only said – the CI said he uses the side door. I don't think that makes it a front door for knock and talk. But here, of course, the officers didn't just proceed from the front around to the side. They drove to an alley behind. There's a complete fenced wall guarding this backyard. They happen to find a neighbor willing to open his gate to let them into his backyard. And then from there, they make their way through. So your argument is that they entered the curtilage in the backyard? Backyard. Or the non-curtilage. I always get the two confused. But they entered – they inappropriately entered the backyard, and once they did, everything else that follows can't – fails. That's my position, yes. How did they – how did they access, ultimately, the backyard from the other person's yard? Is there a gate? You know, Your Honor, I have to be honest. There's – I don't know how much I can say about that, because it's really not in the record. If the Court wants to give me permission to say what I've heard, I can. But it's – it's not in the record. There's no evidence it was a shared backyard. They were able to do it. And I – you know, I just – unfortunately, it's not in the record. We do have pictures in the record of the side yard. Yes. Yes. You can see the door is recessed into the side. It's unmarked. If you're on the sidewalk, what you would see is a big staircase, some bushes, and then there's sort of a chain link gate. So you can't really see into the side yard. You certainly can't see the door that's, as I said, recessed into the wall, no markings on it to suggest this is a front door. I will reserve my two minutes if you don't mind. You may do so, counsel. Thank you. We'll hear from the government. Good morning, Your Honor. May it please the Court, Michael Beckwith on behalf of the United States. Counsel, do you – do you agree with your opponent that there is nothing in the record that explains how the officers moved from one backyard to the other? Your Honor, those facts were developed during trial, but for the district court at suppression, it is somewhat vague. We do know that the officers were able to go to the north side of the house and then get through that backyard, which apparently a neighbor had access to, and allowed him to flow smoothly and cleanly through that backyard to the side yard, which we do have pictures of. And the side yard shows a common walkway going between what the government believes are two common areas. It's the backyard and the front of the house. So let me ask you the question I asked your opponent in this. When did you get probable cause to believe that he lived there? Your Honor, we believe the issue of probable cause turns on or really becomes the key issue is really when they key that door and when they move through the door. So the question is – Up until that point, you don't think there was probable cause? No, no, no. We do, Your Honor. We're not – we can discuss when the probable cause was. Well, that's what I'd like you to discuss. Tell me what – That's the question you're being asked. I understand you don't think it's important, but I might. So tell me when you think, if we all agree they needed to have probable cause to believe that this man lived there. So in order to enter the premises. So tell me when in the totality of events here the government obtained probable cause or the police obtained probable cause to believe that he lived there. Your Honor, after they keyed the door, but before they opened that door and went through that first door on the side door, they had probable cause. Now, it may have developed prior to that point. Okay. Well, that's what I'm asking you. Do you think it developed prior to that point or not? Your opponent agrees that after they keyed the door, there was probable cause. Do you think they had probable cause before that? I do, but the Court's not required to find this. Well, it may or may – we may or may not be required to find it. We have an opinion by Judge Bybee, and I always get Howard and Harper confused because they both begin with Hs, but I think it's Howard, where he says this is an exacting standard and the government has to, you know, present pretty compelling proof. So my question is the facts seem to be conceded. Tell me where along the way the facts added up to probable cause, and then we can make a decision later which facts can be used and which can't be used. Your Honor, I would support – I would argue that it developed much before they entered the premises. Okay. Tell me when. And I think that's when they're at the door, they're prepared to do the knock and talk, and they hear the defendant dropping garbage off just to the south off of N Street. At that point, the CI's tip, which was a tip given by a known informant, which was – this informant was tested in the past, proven to be reliable, and now we're starting to see corroboration. Wait. Was he tested in the past? I think this record only indicates that he was tested on this occasion. Your Honor, I believe the record indicates that he was tested on one occasion previously. He gave information to these law enforcement officers about another drug trafficker. Well, but my mistake in here, didn't he give the information about this defendant and the other trafficker at the same time? And that he was arrested. That's right. The CI was arrested, but I think during that arrest is when he gave the information. But my understanding is that in 2009, he provided information about another defendant. But you're not contending that his information provided probable cause? No, no, no, no, no. It's the combination of events. Once we get to the door, once we're getting ready to knock on the door, it's the presence of the defendant at this random house in the middle of midtown Sacramento. Fair enough. So now respond to the other side's argument that your entry onto the property taints that discovery. We don't believe it does, Your Honor. I know you don't. Tell me why. Pereira Establishes kind of governs the case law around knock and talks. And here, the officers went to conduct a knock and talk at the district court. In its findings they came in through the backyard. They didn't come up to the front door from the street. Yes, sir. And under Pereira, the issue is where they go, not necessarily how they get there. In this case, they're going to the front. So you may enter the property illegally and then walk around to the front and do the knock and talk? Is that your position? No, Your Honor. No, I don't believe that's it. What we have here is two officers are conducting a brief surveillance before they go to the back. They see a gate in front of them, or they're aware that there's a gate there, based on the C.I.'s information. They then go around the back to see if there's another point from which the defendant could be entering the property. There they encounter a neighbor. The neighbor gives them permission to walk through a common area. They do so and go to the main, what they believe is the main access point. But they enter through the backyard. There are no access points in the backyard, correct? Well, there's a gate that goes through the backyard. No, there's an access point to the property, but there's no doors to the house in the backyard. Yes, sir. So they go through the backyard, and then they walk around to the side door. And you say intending to conduct a knock and talk. Assuming that's true, why doesn't their entrance into the backyard taint what happened after that? They had no warrant to enter the backyard. Their search of the house began when they entered the backyard under the case law, didn't it? No, no, we don't believe that, Your Honor. There's a difference between a search and a knock and talk. The purpose of a knock and talk is to walk up to a house along normal pathways and knock on the door and say, hi, we're here, you want to talk to us. Yes, sir. And this is, as the officers indicated in their deposition or in their statements, that this is an odd neighborhood. It's Victorian homes that have been subjected to a knock and talk. I'm assuming you're right, that they were entitled to walk up to the side door. The question Judge Escanlan asked you and I'm asking you, and I'm still having some trouble with it, is give it all that, assuming all that's right. How did they get to go into the backyard through a gate where there are no entrances and there's no normal, you know, that's not the way officers should enter a house to do a knock and talk? Well, I believe they thought the front gate was closed and inaccessible, and so they're looking for a way to get to that main entry point. What they believe was the front door. The information provided by the law. Is that in the record, that the front gate was inaccessible? Well, what's in the record, Your Honor, is that I believe it was Officer Wilhite said there was a gate on the south side of the house near N Street. So we went around to the back side to see if there was another point of entry. And when they get to the back side, they encounter the neighbor and there is a point of entry. Well, but see, if there's a gate in front that they think they can't get through, which I take it is the implication of their testimony, then I don't understand how they're engaging in a knock and talk by, in effect, going into it, going into the backyard to get around the gate. How does that work? Your Honor, at this point, they're simply trying to get to the door where they think they're going to encounter the defendant and find information about it. Earlier, you referred to the entirety of these backyards as a common area. Is it your contention there's some kind of an alley there that the neighbor gave  Yes, Your Honor. There's an alleyway on the north side of this residence. And so they drove their car back to that, into that alleyway. And then they went to a gate that was there, which apparently was either open or was opened by this neighbor. I'm not sure if they knocked. We don't know the answer, but we do know the gate was opened by a neighbor. And then they went into a common area between these. Well, I guess my question is, how do you define common area in context? In other words, if my backyard is open to the next backyard, but they're all fenced, is it your contention the police can roam freely in those backyards? No, Your Honor, no. No. This is somewhat different because of the way that this neighborhood is structured. You know, one building has several units. And it's not clear from the record if this backyard, what we're claiming is a common area, was for just this building with multiple units or two buildings. Well, it's fenced off, is it not? It is, Your Honor. And there's a gate on it. It is. There is. And is there any evidence in this record that anybody except the inhabitants of this building used the backyard? No, Your Honor. Not that I'm aware of. So you're not claiming it's a common area in the sense that people in the neighborhood are free to congregate in that backyard? With one exception, Your Honor. As you see in the defense brief, they claim that it's the next door neighbor, the other house that has access to this common area, that it was the next door neighbor. Well, but I might let my next door neighbor come into my, you know, have opened my yard. The question is whether or not it's a public area that the police are entitled to come into. Well, I believe both houses shared that area. And so there are multiple people back there. And under Parerea, the question is, did the officers go to a place, a location where an uninvited visitor could appear? And here we have, as you've seen from some of the photos, you have a walkway along the side of the house with a ladder set up so someone could get to the second story, possibly do repairs, who knows. You have multiple gas meters. And it's very – it's reasonable that several people seem to use this backyard, the neighbor, other people in this apartment building. If they were to come from the backyard, wanted to speak to Gabriel Johnson, they could have gone right to the second story. Assuming that we conclude that you're wrong about the backyard. Yes, sir. Should the search be suppressed? No, Your Honor. If there is a curtilage, assuming there is a curtilage, we're arguing at this point that there is no curtilage here. But assuming there is a curtilage, then the fact that they went through that curtilage to conduct a knock-and-talk is still sufficient to uphold the search. Our position is that it's not a curtilage, but if there is, under Perea Rea, they can go to an access point where the defendant would expect to see uninvited visitors. And here we have multiple people using that backyard. They could have, in coming from the backyard to the front, stopped by the defendant's residence, knocked on the door. But that's my question. We're in this record. Is there evidence that multiple people used that backyard? All that there is in this record is evidence that the neighbor opened the gate to let the police into the backyard. Your Honor, the record is thin, but we do know that the defendant was there. It's absent on this fact, isn't it? Not entirely, Your Honor, because we have the neighbor. At a minimum, we have the neighbor. And if you look at the SER at page 8, you can see that the side yard has a walkway where there's a ladder put up there. There are multiple gas meters. This is an area through which a variety of people can walk. No, I'm with you on the side yard. I understand that. I'm asking, is there any evidence in this record at all that anybody except the inhabitants of this house used the backyard, with the exception that the neighbor was kind enough to open the gate to let them through? Yes, sir. I would submit the inhabitants, the evidences of the inhabitants of these three units would use that backyard. I know you're submitting it, but what evidence is there in the record? Well, we have three units. I guess that's a reasonable inference, Your Honor. Three? The – in this house, I understand the inhabitants of this house used the backyard. Yes, sir. And then this neighbor that apparently lives next door. Well, what evidence is it that anybody – that the neighbor uses the backyard, as opposed to just simply being able to open the gate to let somebody through? I think he opened the gate to his yard, which then – which connects to – Oh, yeah. I understand. My question is – So it's an open area. That's – I guess that's our point. And that is the record evidence, Your Honor. So you're – you're contending that the photographs demonstrate that there is no fence controlling access from one backyard into the other. That's just one open area. We don't have – we don't have photographs of the backyard, Your Honor. It was developed slightly during trial, but the district court didn't have that during suppression. What we have is just the reports from the officers that said they came in from the north with permission. Right. Yeah. But I'm – and I know we were extending your time, but with Judge O'Scanlan's permission, I'm – now I'm confused. I thought the record was rather clear that the way the police officers accessed the backyard was through a neighbor's – a neighbor's property. I believe that to be true, Your Honor. Okay. And the neighbor opened the gate to let them in. Yes, sir. And in absent the neighbor opening that gate, they couldn't have walked right into that backyard. That's correct. We believe that it's a reasonable inference that these two backyards were connected and open. And so – Well, connected and open is my problem here. They were connected and open because there was a gate between them. No, no, no. I think one way to look at it is you have two yards side by side, but nothing dividing them. And so they entered the neighbor's yard. So help me again. This is not a gate in the middle of the – I mean, they needed somebody to open a gate. So absent opening a gate, they were blocked from entering this yard, were they not? Yes. The west – the far west side. That's correct. Okay. Thank you. All right. Thank you. I'm sorry. May I ask one question? Of course. Of course, Judge. If the Court is unconvinced by your argument that the knock-and-talk rule applies, would you agree, then, that entering the backyard and – of the neighbor's property and moving into the backyard of this residence invaded the curtilage? And at that point, they had to have probable cause to believe that Mr. Morgan resided there. Your Honor, if I understand what you're saying, there are three things that would have to happen there. One, there would be a curtilage. If there is a curtilage, then the only way they can be inside of that curtilage is if they were engaged in a knock-and-talk, as the district court in this case found. I think it's SCR 92. The district court found that the men were going to that house for the sole purpose of contacting the defendant, not to engage in a search, but to make contact with the defendant. If there is a curtilage, then we must have – then we stand or fall on that fact. And there's no – I don't think there's any argument that the Court's finding of that fact was wrong. That's a clear-error standard that the Court would apply. The district court said that in moving into that backyard, in moving to the side door, the east door of this residence, that the officers were engaging in a knock-and-talk. If the Court – So if you lose that point, if we find that that particular finding was clearly erroneous, Mr. Morgan wins? Mr. Johnson would – yes, sir.  Mr. Johnson wins. He would win. I mean, if – two things have to happen, though. One, there has to be a curtilage. And, two, they had to invade the curtilage without the purpose of doing a knock-and-talk. And the distinction there is that unless we find that these backyards were open to the public, there was a curtilage. A person's backyard is the curtilage if it's fenced. If it's fenced and not a common area. I think a good distinction can be drawn. This Court has found that hallways in locked, closed apartment buildings, which are much more secure than the areas we're talking about in this case, do not have a reasonable expectation of privacy. And our position is that the defendant doesn't have a reasonable expectation of privacy in the areas around his house because these are common areas, because there are multiple people moving along that side yard, there are multiple people, including his next-door neighbor, the residents of this apartment complex, using that backyard. Our position is that these are common areas. And if you look at SER 8, you'll see that the side walkway there also has a second series of buildings right next to it. So people are looking down onto that, into that area. And so there's very little expectation of privacy there. Our position is that there's no curtilage. Thank you. Thank you, counsel. We understand your position very well, and we've let you go way over time. Thank you, Your Honor. Thank you. We'll hear from Ms. Wiggin. You have some reserve time. Thank you. What's your position on SER 8, that side path? Right. I have my SER open to that. Well, Your Honor, you know, I think it's the cartilage. And the fact is that it's the cartilage. Correct. This is if you had gone inside the front gate, which Officer Wilhite says was unlocked, so they could have actually gone in that way. But if you'd gone inside the front gate, this would be a picture of it. Now, this, of course, is taken not on the day of the search, so we don't know exactly what was back there. There is a ladder pushed up against the side. The idea that that's an entrance for the second-floor people, I think, is a joke. They have a stairway that they use. That's not an entrance to their home. Yes, if you live next door, you can see into it. In Pereira and Jardines, they talk about the fact that it's open to view does not mean it's not the cartilage. And, moreover, there's almost no yard in urban or suburban America that would be cartilage if the fact that your neighbor's in their second floor can see in robs it of that character. Assuming that the side yard is not cartilage, what's your position on the backyard, the north side, as the north side, as the government says? Your Honor, there is no evidence that anyone besides clearly the people who can use this east side door can go down the path and use the backyard. There's not even evidence that anyone else in the apartment has a route into that backyard. There's no evidence that it was actually a common yard with the next-door neighbors. Yes, the police found a way to get over there. They said that no one at the N Street home they searched gave them permission to be in that backyard. There's no evidence that the person next door who let them into a gate to his backyard actually had permission to let them into the other backyard. Is it a common gate? My understanding is that there's a wooden fence all the way to the edge of my client's the house he lived in. Then next door, the neighbor has a gate that can swing open to the neighbor's property. Which would provide access to the property in which you live. Well, they made their way there. Again, I, you know, there's no picture, there's no testimony in the record about. But I do dispute that it's a common yard. There's absolutely no evidence of that. How do you respond to the government's argument that if an old single-family Victorian home is split up into three apartments, the fact that the occupiers of those three apartments have access to a backyard makes it open to the public that the police can enter at will? Well, Your Honor, I think that the Fluker case from this Court, the Fixell case from the Fifth Circuit talk about the difference between a small unit that's been divided into two or three apartments. And if people in that apartment don't open that space to the public to traverse, then I think it remains the cartilage. It's different than a giant complex that many guests will be using and many visitors will be using. So I would argue it's still the cartilage. Very well. Thank you, counsel. The case just argued will be submitted for decision.
judges: Singleton, O'scannlain, Hurwitz